UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EUGENE F. DANTZLER,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY AND COUNTY OF SAN<br>FRANCISCO,<br><br>    Defendant. | Case No. 16-cv-03119-EMC<br><br>**ORDER GRANTING DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 45 |

Plaintiff Eugene F. Dantzler sues Defendant the City & County of San Francisco ("SF"), his former employer, for disability discrimination under federal law. Currently pending before the Court is SF's motion for summary judgment. Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** SF's motion.

## I.  FACTUAL & PROCEDURAL BACKGROUND

Evidence submitted by the parties in conjunction with the summary judgment papers establishes the following facts as either uncontroverted or viewed in Mr. Dantzler's favor.

A.  Position as 9163 Transit Operator

Mr. Dantzler started to work for SF's Municipal Transportation Agency ("SFMTA" or "MTA") in July 2000. *See* Baluyot Decl. ¶ 3. Ultimately, he was terminated in February 2015.

During his employment with SF, Mr. Dantzler worked as a 9163 Transit Operator. *See* Baluyot Decl., Ex. A (notice of probationary status, dated July 2000). "The 9163 Transit Operator [position] is considered a 'Service Critical' position." Baluyot Decl. ¶ 4. A 2012 description of the position notes that a 9163 Transit Operator

> operates a variety of transit vehicles such as diesel and electric
> motor coaches, cable cars, streetcars and light rail vehicles.
> Essential functions include: conducting pre-operational inspection of
> the transit vehicle; safely navigating the vehicle through traffic
> along assigned routes under various environment conditions in
> accordance with traffic laws and departmental regulations; . . .
> collecting fares from passengers and issuing transfers; . . .
> communicating instructions to passengers . . . ; conducting post-
> operational inspection of the outside vehicle; contacting central
> control regarding various emergencies; [etc.].
>
> Nature of work . . . may require standing and/or sitting for prolonged
> periods of time; performing different physical activities such as
> pulling poles, resetting retrievers to return disabled transit vehicles
> to service; and assisting in the movement of disabled transit vehicles
> when possible. . . .

Baluyot Decl. ¶ 4 & Ex. B (job description).

Minimum qualifications for the 9163 Transit Operator job include possession of or ability to obtain a class B driver's license "with a Passenger (P) Endorsement and no restrictions that prohibit operation of a [MTA] public transit vehicle."  Baluyot Decl., Ex. B.  To obtain a class B driver's license, a person

> must undergo a medical examination by a qualified medical
> examiner.  The purpose of the examination is to determine whether
> the driver is physically qualified to operate a commercial motor
> vehicle ("CMVs") in a manner consistent with the Federal Motor
> Carrier Safety Administration ("FMCSA") regulations ("FMCSRs")
> (49 CFR 391.41-49) and, consistent with the FMCSRs and SFMTA
> policy, confirm that an operator's medical state will not preclude
> him or her from safely transporting members of [the] public on
> SFMTA fleet vehicles without jeopardizing safety to him or herself,
> his or her co-workers, or the public at large.

Amodeo Decl. ¶ 4.[1]

MTA has a Handbook and a Rulebook both of which note (consistent with the above) that a class B driver's license with a Passenger (P) Endorsement is required for transit operators.  The

---

[1] Although Mr. Dantzler has objected to the Amodeo declaration, it is on grounds not implicated here (*i.e.*, not qualified to provide a medical opinion).  Moreover, Mr. Dantzler does not substantively disagree with the above.  *See also* RJN, Ex. B (DMV website on "Commercial Driver License Medical Eligibility") (stating that "[d]rivers of Class A, B, and C commercial vehicles must meet medical requirements established by the federal government and the department"); RJN, Ex. C (Cal. Veh. Code § 12804.9(a)(2)) (providing that, "[b]efore a class A or class B driver's license, or class C driver's license with a commercial endorsement, may be issued or renewed, the applicant shall have in his or her driver record a valid report of a medical examination of the applicant given not more than two years prior to the date of the application by a health care professional").

Handbook and Rulebook also note that a medical card is required.  *See* Baluyot Decl., Ex. D (Handbook ¶ 4.2.1) ("A current California Class B-P License, Medical and VTT [verification of transit training] card is required to operate a vehicle . . . ."); Baluyot Decl., Ex. E (Rulebook ¶ 2.11.2) ("Employees that operate rail vehicles shall maintain a valid California Class B Commercial Driver's License with a 'Passenger (P)' and a valid medical card.").  Medical card refers to a Medical Examination Certification.  *See* Baluyot Decl. ¶ 5.  MTA "exclusively designates and relies on the Occupational Health Services Division ('OHS') at [Zuckerberg San Francisco General Hospital and Trauma Center] to conduct the medical examinations of its employees" and issue medical cards.  Baluyot Decl. ¶ 6.

B.     Mr. Dantzler's Medical Condition

It appears that, in or about 2009, Mr. Dantzler was still working for MTA as a 9163 Transit Operator when he was diagnosed with hypertrophic cardiomyopathy ("HCM").  *See* Dantzler Decl., Ex. A (Docket No. 53, at 11) (medical examination report, containing Mr. Dantzler's handwritten note "Heart disease Hypertrophic Cardiomyopathy Obstructive 4/28/09").  "HCM is a form of heart disease in which the heart muscle (myocardium) becomes abnormally thick (hypertrophied).  The thickened heart muscle can make it harder for the heart to pump blood.  In some cases, the thickened heart muscle can cause shortness of breath, chest pain or problems with the heart's electrical system, resulting in life-threatening abnormal heart rhythms (arrhythmias)."  Amodeo Decl. ¶ 8.[2]

---

[2] Mr. Dantzler has objected to the Amodeo Declaration on the grounds that the declarant is not qualified to offer a medical opinion.  However, there is no real dispute about what HCM is.  For example, the American Heart Association website describes HCM as follows.

> Hypertrophic cardiomyopathy occurs if heart muscle cells enlarge and cause the walls of the ventricles (usually the left ventricle) to thicken.  The ventricle size often remains normal, but the thickening may block blood flow out of the ventricle.  If this happens, the condition is called obstructive hypertrophic cardiomyopathy.
>
> Sometimes the septum, the wall that divides the left and right sides of the heart, thickens and bulges into the left ventricle.  This can block blood flow out of the left ventricle.  Then the ventricle must work hard to pump blood.  Symptoms can include chest pain, dizziness, shortness of breath, or fainting.

MTA knew about the HCM diagnosis in or about late 2011. In spite of this knowledge, Mr. Dantzler was allowed to work as a 9163 Transit Operator based on medical assessments made for MTA by (1) Michael Amodeo, a nurse practitioner and physician's assistant employed by SF's Department of Public Health ("NP Amodeo"), and (2) Raymond Meister, a supervising doctor. According to NP Amodeo and Dr. Meister, Mr. Dantzler met the standard to obtain a medical certification for one year, from August 2011 to August 2012. However, they also found that Mr. Dantzler was required to submit to a periodic evaluation due to, *inter alia*, the HCM, and a follow-up examination was scheduled for December 2011. *See* Dantzler Decl., Ex. A (Docket No. 53, at 12) (medical examination report).

In or about October 2011 – *i.e.*, before the December 2011 follow-up examination – NP Amodeo gave Mr. Dantzler a form for his treating cardiologist to fill out. *See also* Supp. Dantzler Decl. ¶ 3 (stating that NP Amodeo "demanded paperwork from my doctors regarding my heart condition"). The form was titled "Outpatient Consultation Request." In the form, NP Amodeo explained that a consultation was being requested because

---

. . . .

In both obstructive and non-obstructive HCM, the thickened muscle makes the inside of the left ventricle smaller, so it holds less blood. The walls of the ventricle may stiffen, and as a result, the ventricle is less able to relax and fill with blood.

This can raise blood pressure in the ventricles and the blood vessels of the lungs. Changes also occur to the cells in the damaged heart muscle, which may disrupt the heart's electrical signals and lead to arrhythmias.

Some people who have HCM have no signs or symptoms, and the disease doesn't affect their lives. Others have severe symptoms and complications. They may have shortness of breath, serious arrhythmias or an inability to exercise.

It is rare, but some people with hypertrophic cardiomyopathy can have sudden cardiac arrest during very vigorous physical activity. - The physical activity can trigger dangerous arrhythmias.

http://www.heart.org/HEARTORG/Conditions/More/Cardiomyopathy/Hypertrophic-Cardiomyopathy_UCM_444317_Article.jsp#.WgyJUWfruRs (last visited December 22, 2017).

Accordingly, any objection in this regard is overruled as moot.

4

[y]our patient is being evaluated for a DMV medical exam certification to drive commercial motor vehicles (CMV). This is a safety-sensitive job that involves operating public transit vehicles. He has a history of hypertrophic cardiomyopathy (HCM) with work-up done at Kaiser over [the] last number of years. His CMV medical certification was suspended as the patient *newly revealed* the following medical history, per Kaiser documentation, upon presentation here for CMV medical examination:

- HCM for a number of years.
- 1.5 years of progressive DOE and exertional chest tightness and fatigue
- Syncopal episode 3/2011
- Holter monitoring.
- Family hx: Father: died at 51 of CHF from viral cardiomyopathy[;] Brother: 40's, "small" MIx3
- Other extensive work-up done at Kaiser

We must assess if a significantly increased risk of sudden incapacitation exists and your assistance is needed. Assessment is done per Federal Motor Carrier Safety Administration (FMSCA) medical expert panel (MEP) opinions and Medical Review Board (MRB) recommendations:

> *In 2002, it was recommended that drivers with echocardiographically diagnosed HCM not be qualified. Those with borderline hypertrophic cardiomyopathy (HCM), hypertensive hypertrophic cardiomyopathy, or other similar diagnosis could not be qualified but should be reevaluated after 1 year. With the current recognition that not all patients with [such] are at high risk of sudden incapacitation, the Medical Expert Panel (MEP) recommended that since the individuals who meet the following criteria are at lower risk they could be medically certified.*
>
> - *No history of cardiac arrest*
> - *No spontaneous sustained ventricular tachycardia (VT)*
> - *No non-sustained VT*
> - *Normal exercise blood pressure (e.g., no decrease at maximal exercise)*
> - *No family history of premature sudden death*
> - *No syncope*
> - *Left ventricular septum thickness < 30mm*

- Please assess fully, noting FMSCA guidance above, and provide documentation of current medical status and plan.

- Please be sure to check the appropriate box below.

Dantzler Decl., Ex. A (Docket No. 53, at 17) (emphasis in original).

Mr. Dantzler's treating cardiologist, Dr. O'Kelly, completed the form in December 2011, checking off the box that Mr. Dantzler "MAY perform safety sensitive duties as commercial

5

motor vehicle driver, operating public transit vehicles." Dantzler Decl., Ex. A (Docket No. 53, at 17) (emphasis in original). Dr. O'Kelly also provided some medical records in support. *See, e.g.*, Dantzler Decl., Ex. A (Docket No. 53, at 24-25) (providing an assessment and plan for Mr. Dantzler).

Mr. Dantzler asserts that NP Amodeo made multiple requests for information from his doctors, and not just the request identified above: "Every time I brought information in to Mr. Amadeo [sic] per his requests, he would demand additional information which had not been previously requested and which was not needed." Supp. Dantzler Decl. ¶ 3. According to Mr. Dantzler, even his doctors believed that the "additional information requests were unnecessary. My primary care physician, my cardiologist, and my cardiovascular surgeon all stated to me that these requests were stressing them out, or asked 'what the hell he wanted,' or expressed to me that these requests were gratuitous." Supp. Dantzler Decl. ¶ 3.[3] Mr. Dantzler maintains that, because of NP Amodeo's repeated requests for information, it took him "five (5) extra months to get back to work." Supp. Dantzler Decl. ¶ 3.

It appears that Mr. Dantzler's medical situation worsened or at least did not improve. In his deposition, Mr. Dantzler testified that he was having blood circulation issues, shortness of breath, dizzy spells, and fainting spells and, upon getting a second opinion, he was a referred to a cardiac surgeon who immediately scheduled him for surgery. *See* Dantzler Depo. at 148-49. Accordingly, in or about July 2012, he had surgery (a septal myomectomy) to address his HCM. *See* Dantzler Depo. at 149-50. Dr. Gordon was Mr. Dantzler's cardiac surgeon.

Mr. Dantzler was authorized to take a leave of absence from his job with the MTA because of his HCM. The authorized leave was from April 6, 2012, to April 5, 2013. *See* Baluyot Decl., Ex. F (notice of leave of absence expiration). As indicated above, Mr. Dantzler's surgery appears to have taken place within this timeframe, *i.e.*, in or about July 2012.

---

[3] Mr. Dantzler's reference to his surgeon is problematic in that he does not appear to have had any heart-related surgery until July 2012 (as discussed below). The Court, however, does not see this as being anything but an innocent error on the part of Mr. Dantzler.

C.     Return-to-Work Medical Evaluation

On March 25, 2013, MTA's Return to Work Unit ("RTW") sent Mr. Dantzler a notice that his leave was due to expire. RTW is a part of MTA's Human Resources Department and ensures that "employees for work for SFMTA in 'Safety-Critical' positions are medically and otherwise qualified to return to work following a leave of absence of five or more days." Baluyot Decl. ¶ 2. In the notice, RTW specified that, "[i]n order to return to work at the expiration of your approved leave of absence, you must first report . . . for return to work processing." Baluyot Decl., Ex. F. However,

> [b]efore an operator can even start the RTW process, he or she must submit a notice from a health care provider indicating that he or she is cleared to return to work full duty without restrictions. The verification serves to confirm that the returning employee does not presently have a disability that may require reasonable accommodation. It is not intended to be in lieu of the medical certification that an operator must submit with his or her application to renew a California "Class A" or "Class B" commercial driver's license ("CDL") and as required by SFMTA to otherwise resume driving duties.

Baluyot Decl. ¶ 8; *see also* Amodeo Decl. ¶ 7 (testifying that, "before a SFMTA operator can undergo a medical examination by OHS, he must first obtain approval from his health care provider to return to work 'full duty' and 'without restrictions'"; adding that this "in no way replaces the requirement that transit operators must also obtain medical certification in accordance with state and federal law from a medical examiner before he or she can resume commercial driving").

After Mr. Dantzler's leave expired on April 5, 2013, he reported to RTW. "RTW directed him to report to OHS for an appointment to obtain his medical certification." Baluyot Decl. ¶ 10 & Ex. G (letter from License & Medical Unit of MTA, dated April 5, 2013, stating that "[o]ur records indicate that your medical card will expire soon" and that "[y]ou have been scheduled for an appointment at S.F. General Hospital" on April 8, 2013).

1.     First Meeting with NP Amodeo

On April 8, 2013, Mr. Dantzler met with NP Amodeo, *see* Amodeo Decl. ¶ 7, who had previously approved his medical certification in late 2011. At the appointment, Mr. Dantzler

provided NP Amodeo with several documents.  In one of the documents, Mr. Dantzler indicated, *inter alia*, that he had had "open heart surgery for a septal myomectomy" in July 2012 and identified Dr. Gordon as a treating physician.  Amodeo Decl, Ex. B3 (medical examination report, filled out by Mr. Dantzler).  In another document, Dr. Gordon's office indicated that "[Mr.] Dantzler was given telephone or secured messaging advice" which was that **"[Mr.] Dantzler can return to full duties with no restrictions on 4/5/2013**."  Amodeo Decl., Ex. B3 (Kaiser Visit Verification Form) (emphasis added).

NP Amodeo proceeded to medically examine Mr. Dantzler.[4]  During the examination, NP Amodeo informed Mr. Dantzler that "none of the FMCSA medical reference guides at [that] time included any information regarding the specific effect of septal myomectomy on one's ability to drive CMVs" – presumably because, at that time, "septal myomectomy was still a new procedure for treating [HCM] and not one that individuals in the field of occupational health had much experience assessing."  Amodeo Decl. ¶ 8.  NP Amodeo thus told Mr. Dantzler that he "was going to need more information to assess whether [Mr. Dantzler], in his post-operative state, could safely operate CMVs and be granted medical certification for licensing purposes."  Amodeo Decl. ¶ 8.  NP Amodeo also told Mr. Dantzler that he "would separately provide [Mr. Dantzler] with consultation forms for him to give to his health care providers."  Amodeo Decl. ¶ 8.  According to NP Amodeo, he "anticipated needing additional information because – especially where a heart condition is involved – [he] want[s] the operator's health care providers to understand that they are giving their endorsement for an operator to return to a safety-sensitive opposition (as opposed to just a desk job where performance of the operator's job duties lacks the potential of putting others' lives at risk)."  Amodeo Decl. ¶ 8.

After seeing Mr. Dantzler on April 8, 2013, NP Amodeo researched HCM and septal myomectomy "to determine if there were any circumstances under which OHS could certify him to operate CMVs."  Amodeo Decl. ¶ 9.  One reference source from the FMCSA from 2002 "advised against certification for individuals diagnosed with HCM."  Amodeo Decl. ¶ 9 & Ex. B5

---

[4] As indicated above, Mr. Dantzler has objected to the medical opinions offered by NP Amodeo on the basis that he is not qualified.  That objection is addressed *infra*.

(2002 Cardiovascular Conference Report Recommendation Tables). However, a subsequent

reference source from the FMCSA recommended that that guideline be changed:

> With the current recognition that not all patients with HCM are at high risk of sudden incapacitation, the MEP [expert panel] recommended that since the individuals who meet the following criteria are at lower risk they could be medically certified.
>
> - No history of cardiac arrest
> - No spontaneous ventricular tachycardia (VT)
> - Normal exercise blood pressure (e.g., no decrease at maximal exercise)
> - No nonsustained VT
> - No family history of premature sudden death
> - No syncope
> - Left ventricular septum thickness < 30mm

Amodeo Decl., Ex. B5.

Based on the subsequent reference source, NP Amodeo determined that he "needed [Mr.

Dantzler's] health care providers to address [the above] seven criteria to determine whether

allowing [Mr. Dantzler] to resume driving City fleet vehicles would or would not pose a risk to the

health and safety of himself, his co-workers, and members of the public (both ones he would

transport and other drivers and pedestrians on the road)." Amodeo Decl. ¶ 10. Significantly, NP

Amodeo consulted with a supervising doctor, Dr. Meister, who agreed that additional information

should be provided. *See* Amodeo Decl. ¶ 11 & Ex. B1 (medical notes, dated April 8, 2013). In a

declaration, Dr. Meister states that he does not recall consulting with NP Amodeo regarding Mr.

Dantzler, but, based on his review of the file, Dr. Meister "agree[s] with Mr. Amodeo's conclusion

that it was appropriate to request information regarding the seven-above mentioned criteria from

[Mr. Dantzler's] cardiologist and cardiac surgeon prior to completion of his medical evaluation

and rendering a decision regarding his medical qualification to drive CMVs." Meister Decl. ¶ 7.

Accordingly, on April 9, 2013, NP Amodeo sent a letter to Mr. Dantzler in which he

enclosed "a consultation note [Outpatient Consultation Request] that needs to be fully completed

by your cardiac surgeon." Amodeo Decl., Ex. B6 (letter). NP Amodeo expressly noted in the

letter that "[t]here is further information that may need to be obtained to properly assess for

medical clearance for your job duties," but "[i]t is important to get this consultation request done

first." Amodeo Decl., Ex. B6. The Outpatient Consultation Request stated, *inter alia*:

9

> Your patient is being evaluated for a DMV medical exam certification to drive commercial motor vehicles (<u>public transit vehicles/buses</u>).  He has a history of hypertrophic cardiomyopathy with septal myomectomy 7/31/12.
>
> - This is a <u>safety-sensitive</u> job that needs assessment to determine if significant risk for sudden incapacitation exists.
> - Federal Motor Carrier Safety Administration standards must be met to be medically cleared to drive a bus and transport passengers.
>
>   - Please provide a written statement if you feel Mr. Dantzler is able to perform his full job duties without compromise to the safety of public (passengers he transports, . . . ), his fellow workers, and himself.

Amodeo Decl., Ex. B6 (Outpatient Consultation Request).

According to NP Amodeo, even though he only gave the above Outpatient Consultation Request to Mr. Dantzler, he prepared additional requests:

> I determined, assuming Dr. Gordon confirmed his general belief that [Mr.] Dantzler was fit to operate CMVs, we would need additional information in the following three forms: (a) **a more detailed OCR from Dr. Gordon addressing the seven (7) [above] criteria**, accompanied by test results from a recent echocardiogram (i.e., a diagnostic cardiac ultrasound); (2) **a more detailed OCR from [Mr.] Dantzler's cardiologist (also addressing the seven (7) . . . criteria)** and test results for an echocardiogram as well; (3) measurement of [Mr.] Dantzler's recent blood sugar levels from this primary care provider (i.e., a draw of HgbA1c and measurement of glycosuria in [Mr.] Dantzler's urine).[5] . . . I determined that, **before** we sought all of this information, we first needed to confirm that [Mr. Dantzler's] cardiac surgeon generally believed he was fit to drive commercial vehicles.  If he provided such confirmation, I intended to submit these more detailed forms to [Mr.] Dantzler for his providers' completion.  I also noted that we needed to check [on] [Mr.] Dantzler's blood pressure to confirm it was no higher than 140 over 90 beats per minutes ("BPM").

Amodeo Decl. ¶ 13 (emphasis added); *see also* Amodeo Decl., Exs. B7-9 (additional Outpatient Consultation Requests, dated April 8 or 9, 2013); Amodeo Decl., Ex. B1 (medical notes, dated April 9, 2013) (confirming the above approach).

2. <u>Second Meeting with NP Amodeo</u>

On April 24, 2013, Mr. Dantzler had a follow-up appointment with NP Amodeo.  Mr.

---

[5] *See also* Dantzler Decl., Ex. A (Docket No. 53, at 35) (Outpatient Consultation Request asking Mr. Dantzler's primary medical doctor to do a urine test).

Dantzler brought with him the Outpatient Consultation Request form that NP Amodeo had mailed him.  The form was signed by Dr. Gordon and stated: **"[Mr.] Dantzler may return to work without restriction**."  Amodeo Decl., Ex. B11 (completed Outpatient Consultation Request Form, dated April 18, 2013) (emphasis added).  NP Amodeo then told Mr. Dantzler that he now needed Mr. Dantzler to have his doctors – including Dr. Gordon (the cardiac surgeon) and Dr. Kelly (the cardiologist) – fill out additional Outpatient Consultation Requests, with each Request asking the doctor to address the seven criteria identified by FMCSA regarding HCM.  *See* Amodeo Decl. ¶ 17; *see also* Dantzler Decl., Ex. A (Docket No. 54, at 19-20).

On September 11, 2013, OHS received an Outpatient Consultation Request form that was completed by Dr. Kelly (the cardiologist).  However, Mr. Dantzler apparently had given Dr. Kelly the wrong form to fill out – *i.e.*, the form given to Dr. Kelly was the same "general" form that NP Amodeo had first given to Mr. Dantzler for Dr. Gordon to fill out (and thus the form did not ask Dr. Kelly to address the seven FMCSA criteria).  On the old form, Dr. Kelly stated: "**Mr. Dantzler had normal exercise capacity on exercise treadmill test 7/24/13 . . . with no arrhythmia and normal BP response.  His Holter (8/22/13) showed no arrhythmia.  Echo showed no LV or RV systolic function and no LV outflow tract obstruction.  He is fit to drive commercial vehicles.**"  Amodeo Decl., Ex. B13 (completed Outpatient Consultation Request Form, dated September 7, 2013) (emphasis added).

### 3. Third Meeting with NP Amodeo

On September 18, 2013, Mr. Dantzler met with NP Amodeo a third time.  Mr. Dantzler did not provide any Requests addressing the seven FMCSA criteria.  Mr. Dantzler did provide a medical record from Dr. Kelly (the cardiologist) providing basically the same content as above, *see* Amodeo Decl., Ex. B15 (medical records from Dr. Kelly), and a medical examination report (for commercial driver fitness determination) filled out by another doctor, more specifically, Dr. Jourgensen.  In the report, **Dr. Jourgensen indicated that Mr. Dantzler met the standards for medical certification** but required periodic evaluation.  *See* Amodeo Decl., Ex. B16 (medical examination report).  Mr. Dantzler informed NP Amodeo that he was working not just for MTA but also the U.S. Postal Service, and Dr. Jourgensen had cleared him for return to work at the U.S.

Postal Service.  *See* Amodeo Decl. ¶ 22.

In response, NP Amodeo told Mr. Dantzler that he was

> required to make an independent assessment regarding his medical
> qualification specifically to act as a transit operator for SFMTA.
> While any commercial license in California requires medical
> certification, there are unique and heighten[ed] safety considerations
> that a medical examiner must consider when issuing medical
> clearance for an operating transporting members of the public, as
> opposed to a commercial driver delivering goods (such as mail).

Amodeo Decl. ¶ 22.

NP Amodeo also informed Mr. Dantzler that "all [he] needed to do in order to complete SFMTA's process was submit completed versions of the OCR forms I gave to him on April 24th for this cardiologist and cardiac surgeon," *i.e.*, the forms asking each doctor to address the seven FMCSA criteria.  Amodeo Decl. ¶ 23.  NP Amodeo gave Mr. Dantzler new copies of the Outpatient Consultation Requests for Dr. Kelly and Dr. Gordon.  *See also* Dantzler Decl., Ex. A (Docket No. 54, at 2) (Outpatient Consultation Request for cardiologist, originally dated April 8, 2013, and reissued on September 18, 2013).

At the end of the appointment, NP Amodeo prepared a status report on Mr. Dantzler's medical certification.  The report indicated that Mr. Dantzler's current status was "not medically qualified" because certification was being "withheld."  Amodeo Decl., Ex. B19 (status report).  The report also indicated that a follow-up appointment needed to be scheduled and that Mr. Dantzler should bring with him all requested medical documentation, including the two consultation requests – "fully completely" – that were issued in April 2013.  Amodeo Decl., Ex. B19.  NP Amodeo gave Mr. Dantzler a copy of the status report.  *See* Amodeo Decl. ¶ 24.

According to NP Amodeo, thereafter, neither he nor anyone else at OHS heard from Mr. Dantzler again.  *See* Amodeo Decl. ¶ 26.  "As a result, [Mr. Dantzler's] medical clearance remained withheld, subject to [Mr.] Dantzler providing the outstanding requested information."  Amodeo Decl. ¶ 26.

D.    AWOL Determination

Consistent with its practice, RTW referred Mr. Dantzler's file to Labor Relations because Mr. Dantzler did not follow up with OHS after the third meeting with NP Amodeo.  *See* Baluyot

Decl. ¶ 11. On January 17, 2014, Labor Relations sent a letter to Mr. Dantzler, titled "Skelly Meeting" and "Proposed Recommended Disciplinary Action: Dismissal for AWOL – Absent Without Leave Since April 5, 2013." Helms Decl., Ex. C (letter). The letter set a hearing for January 17, 2014 – *i.e.*, the same day that the letter was issued.

Presumably recognizing the scheduling error, Labor Relations sent another letter to Mr. Dantzler on January 24, 2014. This letter was also titled "Skelly Meeting" and "Proposed Recommended Disciplinary Action: Dismissal for AWOL – Absent Without Leave Since April 5, 2013." Dantzler Decl., Ex. B (Docket No. 52, at 20). The letter set a hearing for February 4, 2014. According to Mr. Dantzler, he did not receive the January 24 letter until after the February 4 hearing date. *See* Dantzler Depo. at 176; Dantzler Supp. Decl. ¶ 4.

At about the same time, and consistent with its practice, RTW sent Mr. Dantzler an "Options Letter." *See* Baluyot Decl., Ex. H (letter, dated January 23, 2014). The letter stated, *inter alia*:

> Our records indicate that your leave expired on April 5, 2013. Our records also indicate that you have not returned to work. You are, therefore, off without official leave. You must consider one of the following options regarding your continued employment with the SFMTA:
>
> 1. Return to Work Immediately. You must secure a written release from your health care provider stating that you can return to work with no restrictions by February 4, 2014. . . .
>
> 2. Request for Reasonable Accommodation. . . .
>
> 3. Apply for Disability Retirement . . . .
>
> 4. Apply for Service Retirement . . . .
>
> 5. Resignation . . . .
>
> If I do not hear from you regarding which option you are choosing by close of business February 6, 2014, you will be considered Absent Without Official Leave (AWOL) and appropriate discipline, up to and including termination, may result based upon your classification's MOU language and Civil Service Rules.

Baluyot Decl., Ex. H.

Many months passed and then, on August 26, 2014, Labor Relations sent another letter to

Mr. Dantzler, this one titled "Skelly Meeting" and "Proposed Recommended Disciplinary Action: Dismissal for AWOL – Absent Without Leave Since April 5, 2013, 2nd Notification."  Helms Decl., Ex. D (letter).  A hearing was set for September 8, 2014.  Apparently, both Mr. Dantzler and his union representative failed to appear for the September 8 hearing.  In his deposition, Mr. Dantzler admitted that he got notice of the September 8 hearing in advance of the hearing.  *See* Dantzler Depo. at 180.  Mr. Dantzler added, however, that it was his understanding that his union representative would appear for that hearing.  *See* Dantzler Depo. at 182.

On September 9, 2014, Labor Relations sent Mr. Dantzler yet another letter, this one titled "Skelly Decision."  The letter noted, *inter alia*, as follows:

> Although on April 5, 2013 you went through the Return to Work Process, you never reported to Woods Division for work.  A letter was sent to you informing you of a Skelly Meeting scheduled on January 17, 2014, during which you would have the opportunity to respond to the charges and recommend action.  You did not attend this hearing with the Superintendent, nor did you respond in writing.  A Second Skelly meeting notification was sent to you on August 26, 2014 with a second hearing date scheduled for September 8, 2014.  Again, we did not receive a response from you, nor did you appear at the hearing.
>
> . . . .
>
> Hearing Officer's Decision:
>
> You have not submitted any leave of absence requests or returned to work since the last Return to Work Processing was approved on April 5, 2014.  Additionally, you did not respond to the Skelly Notice in writing, and you and your union representative failed to appear at the meeting scheduled for September 8, 2014.  Thus, I have no other option than to proceed with the proposed disciplinary action and dismiss you from your position as a 9163 Transit Operator for Absence Without Official Leave (AWOL).

Helms Decl., Ex. E (letter).

Thereafter, Mr. Dantzler filed a grievance over the action taken against him.  On January 14, 2015, MTA sent a letter to Mr. Dantzler informing him and his union representative that a hearing was set for January 21, 2015.  *See* Helms Decl., Ex. F (letter).  (According to Mr. Dantzler, he did not get the January 14 letter until after the January 21 hearing date.  *See* Dantzler Depo. at 185; Supp. Dantzler Decl. ¶ 4.  This may have been because, starting in January 2015, MTA sent letters to Mr. Dantzler, using a P.O. Box address that, according to Mr. Dantzler, he had

14

not used in years.  *See* Supp. Dantzler Decl. ¶ 5 ("The notice did not reach me until after the hearing was conducted as it was forwarded from my closed P.O. Box to my home.  The exact same mistake was made again with respect to a rescheduled Step 2 hearing.").)  The hearing appears to have been rescheduled for February 4, 2015.  *See* Helms Decl., Ex. F (letter). Ultimately, a union representative appeared at the February 4 grievance hearing, but not Mr. Dantzler himself.  According to Mr. Dantzler, he did not get the new letter until after the February 4 hearing date – again, because of the P.O. Box issue.  *See* Dantzler Depo. at 188; Supp. Dantzler Decl. ¶ 5.

On February 13, 2015, MTA's hearing officer sent a letter to a union representative regarding the February 4 hearing.  The hearing officer concluded: "I find the Grievant has violated the Rules listed in the letter of January 17, 2014.  The Grievant is considered AWOL.  [¶] Based on the foregoing the grievance is denied."  Helms Decl., Ex. G (letter).

Subsequently, on February 24, 2015, MTA sent Mr. Dantzler a letter dismissing him from his job as a 9163 Transit Operator ("effective close of business February 27, 2015").  Helms Decl., Ex. H (letter).

## II.     DISCUSSION

### A.     Legal Standard

Summary judgment is proper where the pleadings, discovery, and affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under governing law, and a dispute about such a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> In a typical summary judgment motion, a defendant moves for judgment against plaintiff on the merits of his claim [for which the plaintiff bears the burden of proof].  In such a situation, the moving party [*i.e.*, the defendant] bears the initial burden of identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  The burden then shifts to the nonmoving party [*i.e.*, the plaintiff] to "go beyond the pleadings, and by [his] own affidavits, or by the 'depositions, answers to

interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'"

*Li v. Contra Costa Cty.*, No. 16-cv-02861-EMC, 2017 U.S. Dist. LEXIS 176168, at *14 (N.D. Cal. Oct. 24, 2017) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

B.    <u>Disability Discrimination</u>

The Americans with Disabilities Act ("ADA") prohibits an employer from discriminating against an individual based on his or her disability. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.").

To prevail on his employment discrimination claim, Mr. Dantzler must establish the following: "(1) he is 'disabled' within the meaning of the Act; (2) he is a 'qualified individual' within the meaning of the Act; and (3) he was terminated because of his disability."[6] *Kaplan v. City of N. Las Vegas*, 323 F.3d 1226, 1229 (9th Cir. 2003).

Regarding "disability," the ADA provides as follows:

(1)    . . . . The term "disability" means, with respect to an individual –

(A)    a physical or mental impairment that substantially limits one or more major life activities of such individual;

(B)    a record of such an impairment; or

(C)    being regarded as having such an impairment (as described in paragraph (3)).

. . . .

(3)    . . . . For purposes of paragraph (1)(C):

---

[6] Based on the opposition brief, it appears that Mr. Dantzler is taking issue with his termination only. *See* Opp'n at 3 (arguing that "[t]he alleged discrimination occurred on or about February 27, 2015," *i.e.*, the date he was terminated). Therefore, the Court need not address any other adverse employment action identified by SF such as the "refusal to grant medical certification . . . based on the information that [Mr. Dantzler] did provide," Mot. at 20, except to the extent it relates to his termination.

(A) An individual meets the requirement of "being regarded as having such an impairment" if the individual establishes that he or she has been subjected to an action prohibited under this chapter because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

42 U.S.C. § 12102.

As for "qualified individual," the ADA defines the term as

an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires.  For the purposes of this title, consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job.

*Id.* § 12111(8).

C. Parties' Arguments

In its motion for summary judgment, SF argues that it is entitled to summary judgment for the following grounds:

(1) there is insufficient evidence that the relevant decisionmakers perceived Mr. Dantzler as having an impairment, *see* Mot. at 16 (arguing that Mr. Dantzler improperly conflates disability with medical certification);

(2) there is insufficient evidence that Mr. Dantzler was qualified to perform the job as a 9163 Transit Operator, *see* Mot. at 17-19 (arguing that the medical examination was job related and consistent with business necessity; that Mr. Dantzler's actions prevented MTA and OHS from determining whether he could perform the essential functions of his job; and that MTA/OHS was not obligated to accept the opinion of Dr. Jourgensen which was rendered for a different job with the U.S. Postal Service); and

(3) there is insufficient evidence that Mr. Dantzler was terminated because of a perceived impairment (*i.e.*, the evidence shows that MTA terminated him for legitimate business reasons, specifically, abandonment of job).  *See* Mot. at 20-21.

In his opposition, Mr. Dantzler does not directly address the arguments made by SF but

17

rather responds as follows:

    (1) NP Amodeo was not qualified to give medical opinions, *see* Opp'n at 4 (arguing that only a medical opinion from a doctor should be given consideration);

    (2) a determination as to the sufficiency of the medical information he provided to SF/MTA should have been made by a doctor with a specialty in cardiology, *see* Opp'n at 5; and

    (3) the determination that he was AWOL was improper because, multiple times, he did not receive proper notice of hearings on the matter. *See* Opp'n at 6.

    As discussed at the hearing, the critical question is whether the relevant decision makers intended to discriminate against Mr. Dantzler on the basis of a disability or perceived disability. Mr. Dantzler argues that the AWOL determination and his ensuing termination were the result of such improper intent, but there is no evidence of such. The only nexus between NP Amodeo's actions and the decision makers who made the AWOL determination is that the AWOL determination occurred after Mr. Dantzler failed to provide medical documentation and NP Amodeo's request for additional information was allegedly unwarranted because he was purportedly not qualified to give a medical opinion. This is the fulcrum of Mr. Dantzler's argument. It is meritless for several reasons.

    First, regardless of the merits of NP Amodeo's request for additional information, Mr. Dantzler failed to respond to that request. Notably, he did not ask for additional time to comply with the request (even though he indicates his doctors substantively supported his position that he could return to work); rather, he imply went AWOL. It is his nonresponse that led to his termination.

    Second, even if the validity of NP Amodeo's request would be deemed at issue because it was part of the chain of causation which eventually led to his termination, the question is whether NP Amodeo harbored a discriminatory intent, *i.e.*, an intent to discriminate on the basis of disability, in asking for additional medical information. Mr. Dantzler has offered no evidence of such an intent on the part of the NP. Indeed, even if NP Amodeo was *not* qualified to give medical opinions, it cannot be reasonably inferred that he took action against Mr. Dantzler because

of Mr. Dantzler's disability. Nothing suggests NP Amodeo was not earnestly trying to comply with available medical standards. And to the extent Mr. Dantzler claims NP Amodeo was motivated by some kind of ill-will, Mr. Dantzler's evidence suggests, if anything, that NP Amodeo simply did not like drivers generally. *See* Supp. Dantzler Decl. ¶ 3 ("It was also clear to me throughout my career with the City and County that Nurse-Practitioner Amadeo [sic] was prejudiced against the drivers for MUNI, as well as against myself personally. . . . [W]hile I cannot recall the specific names of the other MUNI drivers who have expressed their grievances against Mr. Amadeo [sic] to me, it was well known in my workplace that Mr. Amadeo [sic] was abusive of his power to control our return to work.").

In any event, Mr. Dantzler's contention that NP Amodeo was not qualified to express any medical opinion, even if relevant, is meritless. As SF represented at the hearing, California law permits NPs to make medical determinations. *See* Cal. Veh. Code § 12804.9(a)(2) (discussing requirement of examination by health care professional and defining "health care professional" as "a person who is licensed, certified, or registered in accordance with applicable state laws and regulations to practice medicine and perform physical examinations in the United States" – *e.g.*, "doctors of medicine, . . . physician assistants, and registered advanced practice nurses"). At the hearing, Mr. Dantzler admitted as much. The Court also notes that, in the federal Social Security context, a nurse's opinion may be considered as medical evidence, even though a nurse is formally not considered an "acceptable medical source" for purposes of the regulations. *See Britton v. Colvin*, 787 F.3d 1011, 1013 (9th Cir. 2015) (stating that "a nurse practitioner is not an acceptable medical source[;] [r]ather, nurse practitioners are defined as 'other sources,' the testimony of whom the administrative law judge may discount if he 'gives reasons germane to each witness for doing so'").

Furthermore, NP Amodeo did not reach a *substantive* medical opinion per se but simply concluded that he needed more information to reach a decision. To the extent that Mr. Dantzler argues that even this constituted a medical opinion that could only be made by a doctor, the record reflects that NP Amodeo *did* consult with a supervising doctor, Dr. Meister, who *agreed* that additional information should be provided. *See* Amodeo Decl. ¶ 11 & Ex. B1 (medical notes,

dated April 8, 2013).  Admittedly, Dr. Meister testified that he does not specifically recall consulting with NP Amodeo about Mr. Dantzler's case.  Nevertheless, Dr. Meister still goes on to testify that, upon review of the files, "I agree with Mr. Amodeo's conclusion that it was appropriate to request information regarding the seven-above mentioned criteria from Plaintiff's cardiologist and cardiac surgeon prior to completion of his medical evaluation and rendering a decision regarding his medical qualification to drive CMVs."  Meister Decl. ¶ 7.  While Mr. Dantzler claims that his own doctors believed that more information was not needed, and that they told him such, he failed to submit a declaration from a treating doctor testifying to such.  Thus, Mr. Dantzler has failed to establish any genuine dispute of material fact.  Perhaps because of this problem, Mr. Dantzler also argues (as noted above) that a determination as to the sufficiency of the medical information he provided to SF/MTA should have been made by a doctor with a specialty in cardiology, *see* Opp'n at 5 – something that Dr. Meister lacks.  But Mr. Dantzler has offered no evidence or law to back up this argument.

Finally, Mr. Dantzler has not offered evidence of a discriminatory intent on the part of any other employee or agent of the City.  For example, there is no evidence of a discriminatory intent on the part of Dr. Meister.  Nor is there evidence of any discriminatory intent on the part of the higher-up decisionmakers who issued the various letters to Mr. Dantzler (*i.e.*, the *Skelly* letters, Options Letter, and/or letters regarding his grievance).  Mr. Dantzler has somewhat suggested a discriminatory intent because he did not get notice of the letters (or at least most of the letters) until *after* the relevant hearings had already taken place.  The problem for Mr. Dantzler is that, even if he was thereby treated unfairly (perhaps his due process rights were impacted), the claim he has brought is discrimination *based on disability*.  It is not reasonable to infer such a discriminatory intent based on the notice problems alone.  This is especially true because, even if all that Mr. Dantzler got was post-hearing notice, he still had an abundance of opportunities to contest the AWOL warnings post-hearing – or for that matter to provide the additional medical documentation sought – yet, he failed to do so.  This is not a situation where SF acted quickly; the first AWOL warning was issued in January 2014, and Mr. Dantzler was not terminated until more than a year later, in February 2015.

### III.    CONCLUSION

Because there is insufficient evidence of discriminatory intent, the Court grants SF's motion for summary judgment. In addition, because the Court is granting the motion for summary judgment, the discovery dispute raised by the parties on January 3, 2018, *see* Docket No. 63 (joint letter), is moot. To the extent SF has asked to be reimbursed the $1,500 cancellation fee for the medical expert, the request is denied. The Court does not find that Mr. Dantzler canceled the IME in bad faith and, in any event, his financial circumstances would make any award in SF's favor unjust.

The Clerk of the Court is instructed to enter final judgment in accordance with this opinion and close the file in this case.

This order disposes of Docket No. 45.

**IT IS SO ORDERED**.

Dated: January 8, 2018

_____

EDWARD M. CHEN
United States District Judge